RECORD NUMBER: 15-1581

# United States Court of Appeals

*for the*

# Fourth Circuit

THE LEISER LAW FIRM, PLLC,

*Plaintiff-Appellant,*

– v. –

THE SUPREME COURT OF VIRGINIA,
THE CIRCUIT COURT OF FAIRFAX COUNTY, VIRGINIA,
HONORABLE BRETT A. KASSBIAN,
JUDGE, CIRCUIT COURT OF FAIRFAX COUNTY,
VIRGINIA, CHIEF JUSTICE DONALD W. LEMONS,

*Defendants -Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANT

PHILLIP BEN-ZION LEISER
LEISER LAW FIRM, PLLC
1749 Old Meadow Road, Suite 630
Tysons Corner, Virginia 22102
(703) 734-5000
pbleiser@leiserlaw.com

*Counsel for Plaintiff-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____        Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                                YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************
I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                    _____
        (signature)                                              (date)

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS……………………………………………........i-iv

TABLE OF AUTHORITIES…………………………………………....v-vii

   I.     Jurisdictional Statement…………………………………...1-5

        A. USDC-EDVA…………………………………….…..1-4

            1.  Leiser's procedural due process claims
                against Judge Kassabian………………………………1

            2.  Leiser's substantive due process claims
                against Judge Kassabian……………………………2-3

            3.  Leiser's procedural due process claims
                against Virginia Supreme Court…………………………...3-4

            4.  Leiser's substantive due process claims against VSC……………..4

            5.  Leiser's due process claims implicate rights secured
                by the Constitution……………………………………..4

        B. USCA-4……………………………………………...5

   II.    Statement of issues presented for review……………………………...5

   III.   Statement of the case…………………………………………5-7

        A. Proceedings in the state trial-court and Leiser's
           resulting due process claims…………………………………....5-6

        B. Proceedings in VSC and Leiser's
           resulting due process claims against VSC…………………………6-7

        C. Proceedings before EDVA………………………………...7

   IV.   Standard of review for Leiser's § 1983 claims………………………...8

i

**V.    Summary of Arguments**………………………………………...8-9

   **A. Leiser's § 1983 complaint asserts an Article III
justiciable controversy**………………………………..…8-9

   **B. The *Rooker-Feldman* abstention doctrine does not apply**…………....9

**VI.    Argument  (Part 1)**………………………………………...10-38

   <u>**Leiser asserted a justiciable controversy under Article III, § 2**</u>

   **A. Introduction**…………………………………………...10-11

   **B. Constitutional underpinnings of Leiser's federal claims**………..11-23

     **1. The *Goldberg* due process dictates, requiring the decision-
maker to articulate the legal and factual bases for his
decision, apply to state courts and their judges**………...............11-13

     **2. The *Matthews* balancing test compels the conclusion
that *Goldberg* applies to state courts and their judges** ………13-23

       **(a) The private interests affected by dispositive
judicial rulings are substantial**……………………………..14-15

       **(b) The risk of an erroneous judicial deprivation
of such property interest through use of the current
procedure is high, as is the probable value of additional
or substitute procedural safeguards, specifically,
imposing the *Goldberg* rule on state courts and
their judges**……………………………………………..15-21

       **(c) Virginia's interest, including the function involved
and the fiscal and administrative burdens that the
additional or substitute procedural requirement
would entail**……………………………………………….21-23

C.  EDVA's rejection of Leiser's contention, that under existing law, the *Goldberg* rule applies to state-court judges, was based upon its conceptual error in assuming that the *Goldberg* line of demarcation lies between the executive branch (administrative agencies) and the judicial branch of government (courts), with the *Goldberg* rule applying to the former but not to the latter………………………………………..23-29

D.  EDVA necessarily found that the substantiality doctrine barred Leiser's constitutional claims……………………………..29-30

E.  Leiser has legal standing to bring this case…………………30-35

　　1.  Leiser has (a) suffered and is threatened with a concrete and particularized injury; (b) that is "fairly traceable" to Appellees' actions………………………...31

　　2.  . . . and (c) Leiser's injury will likely be redressed by a favorable decision in this case…………………………....31-35

　　3.  Leiser prevails under one construction of *Goldberg,* and is defeated under a different construction…………………...35

F.  Leiser's civil rights claims are entitled to various strong presumptions that render them impervious to a challenge as to their justiciability under Article III………………………...35-38

VII.  Argument (Part 2)……………………………………………..38-56

**The *Rooker-Feldman* abstention doctrine poses no obstacle to EDVA's exercise of SMJ over this case**

A.  Introduction……………………………………………...38-41

B.  The issue on appeal presents an issue of first impression…………..41

C.  Purpose of the *Rooker-Feldman* doctrine………………………...41-43

**D.** *R-F* doctrine is the product of a negative inference,
rather than a positive command……………………………………..44-45

**E.** SCOTUS has applied *R-F* only twice………………………………...45

**F.** The *Exxon* court itself admonished the lower federal courts
to interpret *R-F* narrowly…………………………………………....45-47

**G.** In both *Rooker* and *Feldman*, the federal-court plaintiffs
asked for *both* declaratory *and injunctive relief*…………………48-50

   **1.** Analysis of *Rooker*………………………………………48-49

   **2.** Analysis of the *Feldman* case…………………………..49-50

**H.** The legislative history of §1983 supports this Court's
exercise of SMJ in this case…………………………………...50-51

**I.** The enactment of §1983 demonstrated Congress' intent
that the lower federal courts would have some limited
oversight of state court judges……………………………………..52

**J.** The 1996 Amendment to §1983 eliminates the concerns
that inform the *R-F* doctrine………………………………………52-56

**VIII.** Conclusion………………………………………………………..56-57

<u>TABLE OF AUTHORITIES</u>

## I.     CONSTITUTIONAL PROVISIONS

Article III, § 1……………………………………………………………..56

Article III, § 2…………………………………………………………..*passim*

Article VI, § 2………………………..……………………………….39, 52, 54, 56

Amendment XIV……………………………………………………....…..*passim*

## II.     STATUTES

Civil Rights Act of 1866, § 2……………………………………..…………51

Civil Rights Act of 1871 § 1………………………………………..………51, 52

Judiciary Act of 1789, § 25.. ……………………………………..………46, 52

Judicial Code § 237……………………………………………………48

28 U.S.C. § 1257…………………………………………….44, 47, 48, 49, 53

28 U.S.C. § 1291………………………………………………………...…...5

28 U.S.C. § 1331……………………………………………….....4, 41

28 U.S.C. § 1343…………………………………………………………...…4

42 U.S.C. § 1983……………………………………………….......*passim*

## III.     RULES OF COURT

FRCP 12(b)(1)………………………………………………………..5, 7, 8

FRCP 12(b)(6)………………………………………………………....7, 36

VA. R. S. Ct. 5:25…………………...………………………..…..…..6

## IV.     CASES

*Adkins v. Rumsfeld*, 464 F.3d 456 (4th Cir. 2006)…………….....…………42, 44

*Alden v. Maine*, 527 U.S. 706 (1999)……………………………………………..34

*ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989)…………………………………35

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)……………………………….36

*Boumediene v. Bush*, 550 U.S. 1301 (2007)……………………………………………55

*Bowers v. Hardwick,* 478 U.S. 186 (1986)…………………………………………..37

*Burrell v. Virginia*, 395 F.3d 508 (4th Cir. 2005)………………………………...8

*Davani v. Virginia Dept. of Transp.*, 434 F.3d 712 (4th Cir. 2006)…….…....8, 42

*Davis v. Pak*, 856 F.2d 648 (4th Cir. 1988)………………………………...…29, 30

*Dickey v. Greene*, 729 F.2d 957 (4th Cir. 1984)………………………………….36

*District of Columbia v. Feldman*, 460 U.S. 462 (1983)……………....…….*passim*

*Edelman v. Jordan*, 415 U.S. 651 (1974)………………………………………....40

*Ex parte Virginia*, 100 U.S. 339 (1879)………………………….....……...51

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280
(2005)………………………………………………………..…42, 45, 46, 47, 57

*Goldberg v. Kelly*, 397 U.S. 254 (1970)……………………………...…*passim*

*Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975)……………………………..50

*Huaman v. Aquino*, 630 S.E.2d 293 (2006)...……………………………....1

*Hollingsworth v. Perry*, 133 S.Ct. 2652 (2013)………………………..…………31

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123
(1951)………………………………………………………….....18

*Lance v. Dennis,* 546 U.S. 459 (2006)…………………………..………….42, 57

*Lawrence v. Welch*, 531 F.3d 364 (6th Cir. 2008)…………………………….44

*Lewis v. Continental Bank Corp.,* 494 U.S. 472 (1990)………………..……30, 34

*Matthews v. Eldridge,* 424 U.S. 319 (1976)…………………………..13, 14, 23, 25

*Mitchum v. Foster*, 407 U.S. 225 (1972)……………………………...……50, 51

*Moore v. Ogilvie*, 394 U.S. 814 (1969)…………………………………..……… 33

*Mo's Express, LLC v. Sopkin*, 441 F.3d 1229 (10th Cir. 2006)…………..…....41, 44

*Obergefell v. Hodges,* 135 S.Ct. 2584 (2015)……..……………………………37

*Printz v. U.S.*, 521 U.S. 898 (1997)……………..…………………………..…28, 34

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923)……………………….*passim*

*Sheets v. Castle*, 559 S.E.2d 616 (2002)…………………………………………....3

*Sosna v. Iowa*, 419 U.S. 393 (1975)…………………………………………………33

*Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911)……………………..33

*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83 (1998)…… ….*passim*

*Steffel v. Thompson,* 415 U.S. 452, 466 (1974).* ………………………....……43

*Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719 (1980)…………..24

*Verizon Maryland v. Public Service Com'n of Maryland*, 535 U.S. 635 (2002)....................................................................................35

*Vulcan Chemical Technologies, Inc. v. Barker*, 297 F.3d 332 (4th Cir. 2002)……44

## I.     Secondary Authorities

*Common Sense, by Thomas Paine, 1776*……………………………………………40

# I.    Jurisdictional Statement

## A. USDC-EDVA

### 1.  Leiser's procedural due process claims against Judge Kassabian

Leiser's §1983 claims contained in his First Amended Complaint ("FAC"),

were filed pursuant to 42 U.S.C. §1983, against Fairfax County circuit court judge,

Brett A. Kassabian, ("Judge"), alleging that he deprived Leiser of procedural due

process of law, in contravention of the Fourteenth Amendment ("A-14"), as

interpreted by the U.S. Supreme Court ("SCOTUS") in *Goldberg v. Kelly*, 397

U.S. 254 (1970). *Goldberg* requires *any* governmental decision-maker, who is

engaged in making a decision *of a judicial nature*, to articulate the legal and factual

bases for his decision, in order to provide the person aggrieved thereby with a

meaningful opportunity to be heard. Judge violated that principle by sustaining,

with prejudice, and without explanation, a demurrer to several of Leiser's state-

court intentional tort claims, thereby extinguishing those claims—a recognized

property right in Virginia. *Huaman v. Aquino*, 272 Va. 170 (2006). He also

violated Leiser's right to procedural due process by denying his request for leave to

amend his complaint, also without explanation. Leiser filed a complaint in EDVA,

seeking a §1983 declaratory judgment that Judge violated his procedural due

process rights in the course of that state-court litigation. (J.A. at 6, ¶¶ I, II(A); at

22-23, ¶¶ 68-70; at 28, ¶¶ VI (A) – (C)).

1

**2. Leiser's substantive due process claims against Judge Kassabian**

Leiser's substantive due process claims against Judge can be distilled to the following principle:  A state court trial judge does not have a constitutional duty to "get it right."  That is why we have appellate tribunals.  But while state court judges do not have a constitutional duty to "get it right," they *do have* a constitutional duty to *try* to get it right.  To that end, they may not choose to live in blissful ignorance of the well-settled substantive and procedural legal doctrines that govern their decisions; nor may they choose to ignore material facts which are either not disputed, or beyond dispute.  A state court ruling, which, on its face, ignores well-settled state-law substantive or procedural rights, is arbitrary and capricious, and, for that reason, *per se,* unconstitutional.  And those decisions, which inexplicably depart from controlling statutory authority or common law precedent, serve to undermine the rule of law because they rightly erode the public's confidence in the predictability, rationality, and integrity of our justice system.

FAC alleges that Judge *could not have* articulated a legitimate basis for his dismissal of Leiser's claims, which were well-pled and supported by a plethora of legal authority that unambiguously established Leiser's right to pursue them; in fact, not a single Virginia case existed that would have precluded any of the claims Leiser asserted against either McCarthy, or his wife.  Judge's radical departure, *sub*

*silentio*, from well-settled legal principles, deprived Leiser of substantive due process, because he had a vested right in the expectation that his case would be governed by the same legal principles that would presumably govern any other case asserting the same causes of action.  (J.A. at 6, ¶¶ I, II(B), at 16-19, ¶¶ 38-49, at 28, ¶¶ VI (D), (E)).

Under the procedural posture of his state-court lawsuit, and in light of the substantive law that supported his claims, it was an abuse of discretion as a matter of law, and therefore, a violation of Leiser's substantive due process rights, for Judge to decline to grant him leave to amend his state-court complaint.  (J.A. at 6, ¶ II(B); at 29, ¶¶ VI (F), (G))

### 3.  Leiser's procedural due process claims against Virginia Supreme Court

FAC also asserts claims against Virginia Supreme Court and its Chief Justice (collectively, "VSC").  FAC alleges that VSC refused Leiser's petition for appeal from Judge's rulings, and denied his petition for rehearing.  But VSC's decisions refusing petitions for appeal, and thereby denying discretionary appellate review, are considered decisions "on the merits."  *Sheets v. Castle*, 559 S.E.2d 616, 619 (2002).  Therefore, VSC's dispositive ruling refusing Leiser's petition for appeal, handed down without explanation, extinguished Leiser's recognized property right in his state-law claims, and therefore suffered from the same constitutional

3

infirmity as Judge's ruling, by depriving Leiser of a meaningful opportunity to be heard.  (J.A. at 29-30, ¶¶ VI (H), (I), and (O))

### 4. Leiser's substantive due process claims against VSC

Because SCV's decision to deny discretionary appellate review of Judge's final judgment tacitly affirmed those dispositive rulings, it suffers from the same constitutional defects arising from the absence of any controlling precedent to support those rulings.  Sustaining the demurrer to three of Leiser's tort claims was wrong, as a matter of law, as was the decision denying leave to amend.  And by adopting as its own, those decisions which find no support in Virginia law, SCV changed the rules midstream, *sub silentio,* and thereby acted arbitrarily and capriciously, in violation of Leiser's substantive due process rights.  (J.A. at 29-30, ¶¶ VI (J) – (N)).

### 5. Leiser's due process claims implicate rights secured by the Constitution

Because Leiser's due process claims against Appellees raise federal questions arising under A-14, the district court ("EDVA") was obligated to exercise subject matter jurisdiction ("SMJ") over those claims, pursuant to 28 U.S.C. §1331.  And because his complaint is styled as a §1983 civil rights action, EDVA should have exercised SMJ over it, pursuant to 28 U.S.C. §§1343(a)(3) and (a)(4).

**B. USCA-4**

Under 28 U.S.C. §1291, this Court ("USCA-4") may exercise SMJ over this case, an appeal of a final EDVA order entered on 4/28/15, which, under FRCP 12(b)(1), dismissed Leiser's §1983 complaint for failure to assert a justiciable case or controversy under Article III, §2, and for lack of SMJ under the *Rooker-Feldman* (*"R-F"*) abstention doctrine.  Leiser timely noted his appeal on 5/27/15.

## II.    Statement of issues presented for review

1. Whether Leiser's §1983 claims satisfy the triad of injury-in-fact, causation, and redressability—components of the "legal standing" test articulated in *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 103-04 (1998)—thereby conferring upon him standing to assert those claims, and rendering them justiciable under Article III.

2. Whether *R-F* abstention doctrine applies when a state-court loser seeking *only declaratory* (*i.e.,* non-coercive) relief files a federal complaint, alleging injury resulting from a state-court judgment.

## III.    Statement of the case

### A. Proceedings in the state trial-court and Leiser's resulting due process claims

In 2009 Leiser filed a ten-count complaint in the state trial court, asserting various intentional tort causes of action against his former employee and law partner, August McCarthy, arising from their employment relationship.  Three of

5

those claims were also asserted against McCarthy's wife, who was not a lawyer and had never worked for Leiser.  (J.A. at 10-13, ¶¶ 20-24).[1]  The McCarthys filed a demurrer which Judge sustained, in part, with prejudice, as to all three claims against McCarthy's wife, thereby dismissing her from the lawsuit.  He dismissed the civil conspiracy claim against McCarthy, as well.  (J.A. at 13-15, ¶¶ 25-31). Judge declined to grant Leiser leave to amend, despite his timely requests therefor. (J.A. at 14-15, ¶¶ 29, 31-34).  In sustaining the demurrer, Judge declined to offer any explanation for his dispositive ruling that extinguished Leiser's claims against McCarthy's wife, and diminished his claims against McCarthy.  (J.A. at 22, ¶ 67). He also declined to explain why he refused to grant Leiser leave to amend, which, under the procedural posture of that case, constituted an abuse of discretion, as a matter of law.  (J.A. at 15, ¶¶ 36-37).

## B.  Proceedings in VSC and Leiser's resulting due process claims against VSC

Leiser timely noted and perfected an appeal of those rulings to VSC, raising for the first time, in the petition for appeal, his due process claim against Judge. Cognizant of the contemporaneous objection rule, VA. R. S. Ct. 5:25, Leiser asked VSC to invoke both the "for good cause shown" and "ends of justice" exceptions to that rule.  (J.A. at 22-24, ¶¶ 67, 70-73).  VSC convened a three-Justice writ

---

[1] They included tortious interference with contract, tortious interference with business expectancy, and statutory civil conspiracy to injure business.

6

panel to hear argument from Leiser as to why that court should grant his petition for appeal, but ultimately, it court refused his petition, and denied his petition for rehearing, issuing two boiler-plate orders that stated, in a conclusory fashion, that the court had reviewed the record and found no reversible error. (J.A. at 22-28, ¶¶ 65-69, 74-78, 80-81). VSC gave no reasons for those rulings.[2]

### C. Proceedings before EDVA

Next, Leiser filed his §1983 complaint (later amended), which requested a declaratory judgment against both Judge and VSC, stating they had violated his procedural and substantive due process rights. (J.A. at 6, ¶¶ I, II(A); at 28-31, ¶¶ VI (A) – (P)). Appellees filed a motion to dismiss, pursuant to FRCP 12(b)(1) and (b)(6), arguing that FAC failed to set forth a justiciable Article III controversy. They also moved for dismissal under Rule 12(b)(1), on the grounds that EDVA lacked SMJ over those claims, pursuant to *R-F* doctrine. (J.A. at 32-34). A hearing was held on 12/5/14 (J.A. at 72-97), and on 4/28/15 EDVA entered an order and issued a Memorandum Opinion, dismissing Leiser's case on those grounds. (J.A. at 98-108).

---

[2] Leiser petitioned SCOTUS for a writ of *certiorari* to the VSC, but the petition was denied. But unlike VSC, SCOTUS' denial of discretionary appellate review is *not* considered a ruling on the merits of the case.

**IV.    Standard of review for Leiser's § 1983 claims**

EDVA's dismissal of Leiser's complaint, pursuant to FRCP 12(b)(1), on the grounds that Leiser had failed to assert a justiciable Article III case or controversy, presents a pure question of law, and is therefore subject to this Court's *de novo* review. *Davani v. Virginia Dept. of Transp.*, 434 F.3d 712, 715 (4th Cir. 2006). Likewise, its dismissal for lack of SMJ under the *R-F* abstention doctrine is also subject to *de novo* review. *Id. Accord, Burrell v. Virginia*, 395 F.3d 508, 511 (4th Cir. 2005).

**V.    Summary of Arguments**

### A. Leiser's § 1983 complaint asserts an Article III justiciable controversy

Leiser has standing to bring this civil rights action because he has satisfied the triad of injury-in-fact, causation, and redressability, which comprises the core of Article III's case-or-controversy requirement. He has alleged particularized harm, consisting in the deprivation of his due process rights by both Judge and SCV. Their unconstitutional acts, consisting in their failure to articulate the legal and factual bases for their dispositive rulings, are capable of repetition, yet evading review.

Leiser has set forth a claim that succeeds under one interpretation of the law—that state courts are subject to the due process dictates imposed by *Goldberg*—but fails under EDVA's, to the extent *Goldberg* applies only to

8

administrative agency decision-making.  That renders his claim justiciable.  And since EDVA was required to assume the truth of Leiser's factual allegations in his complaint, and since Leiser has asserted his claims in a civil rights action asserted against the state courts, his complaint is entitled to a very strong presumption that it asserts a justiciable controversy.

### B. The *Rooker-Feldman* abstention doctrine does not apply

The *R-F* doctrine is not applicable to a federal claim that seeks only declaratory relief, because unlike appellate review, such relief is non-coercive, and thus does not implicate the concern of that doctrine, which was to prevent the lower federal courts from usurping SCOTUS' exclusive role in exercising discretionary appellate review over the highest state court to reach a decision that involves federal law.  Carefully analyzing the language of the few *R-F* cases decided by SCOTUS, along with the history of A-14, and the legislative history of §1983, including the 1996 amendment that eliminated all but declaratory relief against state-court judges, leads to the firm conclusion that allowing lower federal courts to declare, when appropriate, state-court judicial acts as unconstitutional, but without overturning them, properly balances the competing interests of the supremacy of federal law, comity, and federalism.

## VI.    Argument  (Part 1)

## Leiser asserted a justiciable controversy under Article III, § 2

### A. Introduction

*"If we desire respect for the law; we must first make the law respectable."*
*~ Louis D. Brandeis, Associate Justice, United States Supreme Court*

The contest looming on the horizon is a battle by the People against the tyranny of state courts—their arbitrary exercise of governmental power, in violation of fundamental rights secured by the A-14.  And the ultimate goal of this case is to persuade this Court that the responsibility falls primarily on *its* shoulders—rather than on SCOTUS'—to ensure that the state courts within its circuit embrace the principle upon which *Goldberg* was based:  when our government, through proceedings of a judicial nature, extinguishes a person's property rights, it will explain its reasons for doing so.  Full stop.

Judges are vested with a lot of power to decide people's fates in the context of their legal disputes.  But whenever power is concentrated in a single individual, with very little oversight, that power is often abused.  As observed by the 19th century historian, Lord Acton, "power tends to corrupt, and absolute power corrupts absolutely."

The question is how to ensure that the power vested in judges is exercised in an honest, legitimate, and disciplined manner that is faithful to the law and committed to providing litigants with due process.  Any lawyer who has tried more than a

10

handful of cases knows that judges are not immune from the "honest error and irritable misjudgments" that animated *Goldberg's* concerns. This lawsuit serves as the tonic for that.

We the People insist that the courts of the Commonwealth deliver the justice system that was promised to Us by our founding fathers—a justice system that is truly governed by the rule of law, as opposed to the whim of individual judges, and a justice system in which due process of law is afforded *every* litigant, by *every* judge, in *every* court, in *every* case—no exceptions.

## B. Constitutional underpinnings of Leiser's federal claims

### 1. The *Goldberg* due process dictates, requiring the decision-maker to articulate the legal and factual bases for his decision, apply to state courts and their judges

In Virginia, a tort lawsuit is a recognized property right, *Huaman, supra*, from which it follows that dispositive judicial rulings sustaining demurrers or pleas in bar, or granting motions for summary judgment, or other motions to dismiss, extinguish that property right. And that governmental action is therefore subject to the limitations of A-14, and specifically its due process **guaranty**—which prohibits any State from depriving a person of his property without due process of law.

In its seminal *Goldberg* decision, SCOTUS held that due process must include a *meaningful* opportunity to be heard, so that the property right at issue there could not be terminated by the State, without first affording its owner a *meaningful*

11

opportunity to be heard.  And in order to make a hearing *meaningful*, the decision-maker must articulate the legal and factual bases for a decision that deprives a person of his property.  *Goldberg* at 397 U.S. 254, 267-68.  The *Goldberg* court explained,

> . . . the possibility for honest error or irritable misjudgment [is] too great, to allow [deprivation of the property right at issue in *Goldberg*] without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal.  *Id. at* 266.
> . . .
> Finally, the decisionmaker's conclusion [as to whether the property right at issue in *Goldberg* should be extinguished] must rest solely on the legal rules and evidence adduced at the hearing. . . .  *To demonstrate compliance with this elementary requirement, the decisionmaker should state the reasons for his determination and indicate the evidence he relied on*, . . . *Id.* at 271.  (emphasis added).

The *Goldberg* court recognized that termination of a property interest "involve[d] state action that adjudicate[d] important rights," and based its procedural due process requirements enunciated there on the extent to which the property owner who was wrongfully deprived of his property would be "condemned to suffer grievous loss."  *Id.* at 262-63.  To determine the mandatory procedural requirements for a contemplated governmental deprivation hearing, the *Goldberg* court established a balancing test between the "recipient's interest in

avoiding that loss" versus "the governmental interest in summary adjudication."

*Id.* at 262-63.  Accordingly, it held,

> . . . [C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved, as well as of the private interest that has been affected by governmental action. *Id.* at 263.

*Goldberg* stands for the principle that those whose property rights have been extinguished by our government, through proceedings of a judicial nature, are entitled to more than a metaphorical echo chamber in which to be heard.  The lawyer who stands up to argue before a court that has already made up its mind, based upon improper but un-announced considerations—such as its distaste for the litigant, his counsel, or his claims—is like the solitary hiker in the Grand Canyon, listening to his voice reverberate against the intimidating and impenetrable canyon walls.  Judges who decline to articulate the legal and factual bases for their decisions fail to *demonstrate* compliance with the due process dictates of *Goldberg*.

## 2.  The *Matthews* balancing test compels the conclusion that *Goldberg* applies to state courts and their judges

The *Goldberg* decision must be understood in light of *Matthews v. Eldridge*, 424 U.S. 319 (1976), which further clarified the contours of procedural due process.  Both cases arose in the context of state administrative agency decisions to

13

terminate certain state-created property rights—in *Goldberg*, welfare benefits; in *Matthews*, social security disability benefits. *Matthews* recognized "the truism that 'due process,' . . . is not a technical conception with a fixed content unrelated to time, place and circumstances," *Id.* at 334, and emphasized, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

To determine the specific dictates of due process the government must afford in a particular situation, *Matthews* refined the *Goldberg* balancing test, clarifying the three factors that must be balanced:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335.

**(a) The private interests affected by dispositive judicial rulings are substantial**

The private interests affected by official action in state-court civil lawsuits are as multifarious as the universe of legitimate subjects of tort and contract litigation. But in order for a court to distinguish the property interest (welfare benefits) at issue in *Goldberg* from those at issue in civil litigation, it would have to come up with a fairly nuanced argument to explain, (for example), that government-funded

14

welfare benefits are private interests of great consequence, and therefore subject to the *Goldberg* requirements, but the right of an injured pedestrian, rendered a quadriplegic by the gross negligence of a drunk driver, to recover, through court proceedings, compensation from that negligent driver and/or his insurance company, for past and future medical bills, lost income, and pain and suffering, is substantially less significant, so as not to warrant the same due process protections mandated by *Goldberg*. For the purpose of assessing the level of constitutional protection they warrant, the private interests at stake in state-court litigation are often significant enough so as not to be meaningfully distinguishable from the private interests at issue in *Goldberg*.

**(b) The risk of an erroneous judicial deprivation of such property interest through use of the current procedure is high, as is the probable value of additional or substitute procedural safeguards, specifically, imposing the *Goldberg* rule on state courts and their judges**

In Virginia, civil litigants do not have an automatic right to an appeal. They may petition VSC, but that court exercises discretionary appellate review, and grants only 10-15% of the petitions it receives. For most litigants, then, circuit court is their first and only stop on their journey through the justice system, to the "justice" that awaits them at the end. The mere potential, though not guaranteed, and statistically low *possibility* of VSC granting an appeal from a trial court does not obviate the need to cure the constitutional defect inherent in silent judicial rulings at the trial court level.

15

The paucity of VSC appeals granted each year, relative to the number of final judgments and orders issued by Virginia trial courts over that same period, means, *de facto,* there is a relative absence of judicial oversight over state circuit court civil tort and contract cases, creating an environment in which it becomes far too easy for those judges who are dis-inclined to do the arduous work of ascertaining the governing law and correctly applying it to the facts in the record, to substitute their personal opinions for well-reasoned judicial decisions.  The stark reality in Virginia is that because state court judges can get away with it, some of them, on some occasions, apply the law only when it advances their apparent ends-justifies-the-means judicial philosophy—a philosophy that, with a wink and a nod, embraces a results-oriented justice system that too often substitutes the personal whims of individual judges for the steady application of the rule of law that lends consistency and predictability to, and commands respect for, our justice system.

The current procedure—or, more accurately, the absence thereof—is fundamentally flawed, because by default, the determination of the process that is due is left up to the unfettered discretion of individual judges, some of whom are scrupulous about explaining the bases for all of their rulings; while others are not. But when judges decline to explain their dispositive rulings, it is generally because they can't—at least not by any coherent legal argument.  And so, under the *status quo*, litigants whose property rights in their claims have been extinguished by the

16

government, through its dispositive judicial rulings, are too often never informed of the reason(s) why their government deprived them of that property interest. That is not acceptable.

Dispositive rulings that are *not* explained by the judges who issue them breed cynicism toward and mistrust of judges; generate suspicion about potential ulterior motives for their decisions; and erode confidence in the integrity of our justice system. Dispositive rulings issued as silent edicts handed down from on high, to the effect of, "motion granted; case dismissed; (bang the gavel); next case!" are not respected by litigants, their counsel, or the public. Nobody trusts rulings, unaccompanied, as they too often are, by explanations for their legal and factual underpinnings. Nobody ever has; nobody ever will; and nobody ever should.

Due process requires application of uniform procedures in a particular context. And it is only the consistent application of the *Goldberg* rule that will keep judges intellectually honest and judicially disciplined, for, as Justice Benjamin Cardozo wisely observed, "Sunlight is the best disinfectant; electric light, the most efficient policeman." A justice system that demands faithful adherence to the *Goldberg* rule will serve to expose those emperors who wear no clothes—those judges who decide legal controversies based upon improper considerations.

During a colloquy between Leiser and VSC at the writ panel hearing, one of the Justices suggested that litigants could infer the reasons for courts' decisions by

17

reading the briefs of the prevailing party. (J.A. at ¶¶ 74-75). That *may* hold true

when the prevailing party has argued one and only one rationale in support of a

dispositive motion, in which case it is possible to infer the rationale that was

presumably—though not necessarily—adopted by the court that adjudicated that

motion. But what happens when the prevailing litigant has argued reasons A-Z in

support of his motion? How is the losing party supposed to correctly discern the

court's rationale for its unexplained decision that deprived him of his property

rights? The point is, due process of law is not a shell game. It is not incumbent

upon a litigant to read the tea leaves, consult a psychic, or purchase an Ouija board

and conduct a séance to determine the rationale for the government's decision to

extinguish his vested property right. Instead, it is the duty and obligation of the

government official responsible for making that decision to justify it, by

articulating his rationale. Only then has that litigant been afforded due process of

law. As expressed by SCOTUS,

> An "appropriate" governmental "determination" must be
> the result of a process of reasoning. It cannot be an
> arbitrary fiat contrary to the known facts. This is
> inherent in the meaning of "determination." It is implicit
> in a government of laws and not of men . . . . *Joint Anti-
> Fascist Refugee Committee v. McGrath*, 341 U.S. 123,
> 136 (1951).

The reluctance of some courts and judges to explain their rationale for decisions

that deprive litigants of their property rights reeks of arrogance, and carries with it

the smell of fear and the stench of self-protection.  Given the universality of the lesson that every toddler throughout history has taught his parents concerning the severe limitations in the persuasive effect of explanations to the effect of, "the-answer-is-no-because-I-said-so!" it is nothing short of arrogance and naïve condescension that permits courts and their judicial officers to treat litigants and their counsel with such flagrant disdain.

It is noteworthy that in any civil tort or contract case, members of the public, not to mention the litigants themselves, can freely access the court's file containing the evidentiary exhibits pertaining to a particular legal controversy.  And they are free to attend court hearings and listen to the testimony of litigants and their witnesses, the arguments of counsel, and the court's issuance of bench rulings.  Thus, the facts of a particular dispute that have been developed in the record are within the public domain.  Likewise, the law governing those facts is within the public domain, available for review at any law library in any courthouse.  And finally, the pleadings arguing, and the orders adjudicating particular legal issues in controversy are also available for public scrutiny.  Thus, besides the facts of a particular dispute and the governing law, the parties' competing arguments and the judicial decisions that have *supposedly* considered those arguments and applied the law to the facts, are also within the public domain.

19

But if the facts of a particular dispute, the law governing those facts, and the ultimate judicial decision applying the law to those facts are all within the public domain, why is the thought process and legal reasoning that applies the governing law to those facts *not* within the public domain? Such incongruity between the ready access of the public and the litigants—the very people whose property rights are being adjudicated—to the former, and the secrecy with which state courts often guard the latter, has nothing to do with protecting the due process rights of litigants. Instead, it represents a cynical effort by judges and the state courts, as institutions of government, to protect *themselves and each other* from unwanted scrutiny and criticism of their decisions, and from effective appellate review.

Such a conception of a justice system has no place in our democracy. The only path forward to generating respect for our justice system is to embrace the inalienable truth, that the *only* vaccine available to protect judges from scrutiny, criticism, and appellate review, is their active demonstration, through their faithful adherence to the *Goldberg* due process dictates, that they correctly applied the governing law to the facts developed in the record of the particular controversy at issue. In conclusion, this second factor in the *Matthews* balancing test, the risk of an erroneous deprivation of such property interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards, weighs

20

heavily in favor of applying the *Goldberg* rule to dispositive state-court judicial decisions.

### (c) Virginia's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail

Any projected increase in congestion of court dockets, and the resulting drain on the public fisc that could ensue from imposing on state court judges the requirement that they take the time to explain their dispositive rulings, is imaginary. First, the vast majority of cases will not require a written *opinion*; more often, a few sentences will suffice. Second, any *de minimus* additional time invested by judges to explain their dispositive rulings is an investment that pays handsome dividends, for rulings that are explained are generally understood and accepted, because often they are correct. And as a consequence, judicial explanations for dispositive rulings minimize unnecessary, unmeritorious, and ultimately unsuccessful motions for reconsideration and appeals.

And in those instances where they fail to persuade a litigant at the losing end of a dispositive ruling, well-reasoned explanations can serve to streamline appellate arguments, thereby conserving the resources of the appellate courts, by eliminating "shotgun approach" appeals from litigants and their counsel who have been left dumb-founded by a dispositive ruling unaccompanied by any explanation, and which, for that reason, seems to require a regurgitation on appeal of every legal

argument raised in the trial court. Instead, motions for reconsideration and appeals, filed in response to dispositive rulings that are accompanied by judicial explanations, tend to be more sharply focused on legitimately contested legal issues, thereby *conserving* judicial time at both the trial and appellate levels, and consequently, imposing less demand on the public fisc.

The proof of the pudding is in the eating. Any concern that imposing the *Goldberg* due process requirements on state trial court judges when they issue dispositive rulings will result in fiscal or administrative burdens that outweigh the clear benefits outlined above is belied by experience. Conscientious judges, of which there are many, who have honestly and carefully thought through the reasons for their dispositive rulings, do not have much difficulty in succinctly articulating them. The extra minute or two, or five, depending on the circumstances, has not had any appreciable impact on their ability to efficiently manage their dockets.

Nor will applying the *Goldberg* rule to dispositive rulings of VSC, such as when it refuses petitions for appeal, substantially increase the work-load of that court, because, presumably, that work will have already been done for them by trial court judges who, in accordance with their *Goldberg* obligations, have articulated the legal and factual bases for their dispositive rulings that are the subject of that appeal. When denying discretionary appellate review, VSC will

22

frequently have only to regurgitate the reasons already provided by the trial court. And, as mentioned above, fewer frivolous and more sharply focused appeals will actually *conserve* VSC's time and resources, thereby reducing pressure on the public fisc. Therefore, this third factor in the balancing test, assessing the burdens that will likely be imposed on the government by the proposed procedure, also weighs in favor of imposing the *Goldberg* rule. In conclusion, consideration of the three factors enunciated in the *Matthews* balancing test necessarily leads to the conclusion that the *Goldberg* due process dictates apply with equal force to Virginia state-court judges, at both the trial and appellate levels, requiring them to articulate the legal and factual bases for their dispositive rulings.

**C. EDVA's rejection of Leiser's contention, that under existing law, the *Goldberg* rule applies to state-court judges, was based upon its conceptual error in assuming that the *Goldberg* line of demarcation lies between the executive branch (administrative agencies) and the judicial branch of government (courts), with the *Goldberg* rule applying to the former but not to the latter**

Appellees argued below, and EDVA agreed, (J.A. at 104), that the *Goldberg* due process requirements are limited to decisions of administrative agencies, rather than courts. There is some superficial appeal to selecting that most obvious line of demarcation for application of the *Goldberg* rule, since both that landmark decision and the *Matthews* decision arose in the context of administrative agency proceedings. But the problem with establishing the *Goldberg* line of demarcation between administrative agencies, generally (executive branch) and courts of law

(judicial branch) is that it cuts too broadly, because it would necessarily impose the *Goldberg* requirements on the rulemaking (legislative) function of those agencies. It would be tantamount to the federal judiciary requiring state legislatures to publish detailed legislative histories for the laws they enact, in their role as the elected representatives of the People.  Certainly principles of federalism, comity, and separation of powers would deem such overreach a bridge too far.  But such unintended consequences naturally flow from establishing the *Goldberg* line of demarcation between administrative agencies, generally, and the courts.

A sharper scalpel is needed.  It presumably makes better sense to draw the *Goldberg* line of demarcation between administrative agency decisions—*of a judicial nature*—that is, decisions that "investigate, declare, and enforce 'liabilities as they stand  on present or past facts and under laws supposed already to exist.'" *District of Columbia v. Feldman*, 460 U.S. 462, 479 (1983)—and court decisions—*of a judicial nature*, which are the product of the adjudicative process.[3] But that line of demarcation makes sense *only if* there are constitutionally significant differences between those decision-making *processes* at the administrative agency level, on the one hand, and the courts, on the other.

---

[3] contrasted with judicial decisions of a legislative nature—such as VSC's rulemaking decisions in promulgating the Rules of the SCV.  *Supreme Court of Virginia v. Consumers Union*, 446 U.S. 719, 731 (1980)

If anything, that line of demarcation backfires, revealing its own internal inconsistency, because there is a cogent and compelling argument that we can afford the luxury of *less* transparency surrounding administrative agency decisions of a judicial nature, which are typically subject to multiple levels of automatic agency review, some of them *de novo*, in addition to an automatic right to judicial review.[4] Judicial decisions in tort and contract cases, made by Virginia trial courts of record, on the other hand, are subject only to *discretionary* appellate review. Thus, ironically, the opportunity for appellate review, which provides the only seemingly rational basis upon which to even consider drawing the *Goldberg* line of demarcation between judicial decisions of the executive branch as opposed to those of the judicial branch of government, cuts *against* that line of demarcation, and contradicts *Goldberg,* which affirmatively imposed the due process requirements at issue on those agency decision-makers.

Another plausible rationale for establishing the *Goldberg* line of demarcation between decisions of a judicial nature made at the agency level, and those made by courts, is the stricter evidentiary and procedural rules that presumably govern court proceedings, as opposed to the more informal procedures that govern administrative agency hearings. Appellees went to great pains to emphasize all of the myriad protections the state courts supposedly afforded Leiser to ensure they

---

[4] See, *e.g., Matthews*, at 424 U.S. 319, 338-339.

25

respected his due process rights.[5]  Thus, in attempting to sell that boat, they point out all of the impressive bells and whistles it comes with—a satellite-guided navigation system, stability control, heated seats—a real top-of-the-line model. But while all of those bells and whistles are lovely, they are insufficient to distract from the gaping hole in the boat's hull.  Yet, despite its major structural defect, EDVA apparently purchased Appellees' boat. (J.A. at 103-04).

Appellees' rationale must be rejected because its underlying premise chases its own tail.  The more and fancier rules of evidence and civil procedure that are paraded about to persuade the skeptic that state court judges' dispositive rulings are less likely than administrative agency decisions to suffer from intellectual infirmity, the faster the argument runs, around and around, earnestly chasing, but never quite catching its tail, for all of those bells and whistles are meaningless, precisely because of the premise underlying Leiser's argument—that a judge who is not required to articulate the legal and factual bases for his dispositive rulings, and who, alone, gets to make the predicate evidentiary and procedural rulings that presumably support his dispositive rulings, remains virtually free to ignore and/or manipulate those "rules" designed to protect litigants.

---

[5] They argued that Leiser had the opportunity to file written briefs, and the state courts conducted various hearings, with VSC even engaging in a colloquy with him, etc.  (Motion to dismiss at 15-17).

Those evidentiary and procedural safety mechanisms become just more window dressing in the hands of a decision-maker who is bent on deciding a case a particular way, consistent with whatever agenda he happens to be pursuing. Therefore, the superficial distinction between dispositive court rulings and agency decisions of a judicial nature, based upon the stricter rules of evidence and procedure that *are supposed to* govern the former, is meaningless, for it brings us back, over and over, around and around, to the "honest error and irritable misjudgment" that was of such paramount concern to the *Goldberg* court. The hole in the hull is still there.

The seaworthiness of Appellees' vessel thus compromised by the fissure in their *Goldberg* analysis—a fissure created by their administrative-agency/court dichotomy that is based upon the decision-making *process*—leaves them with no choice but to abandon that ship. They must concede that the distinction between agency and court decisions of a judicial nature cannot center around the difference in the formality of the proceedings. But that ineluctable concession forces them into the untenable position that the distinction must lie, instead, in the nature of the decision-maker, himself. Thus, Appellees must justify a *Goldberg* line of demarcation between decisions of a judicial nature issued by administrative agencies, as opposed to dispositive rulings rendered by state courts, based upon

some chimerical intrinsic distinction between agency decision-makers, on the one hand, and judges, on the other.

Such a distinction has been rejected by SCOTUS,[6] and with good reason. In light of the seeming absence of any meaningful objective criteria by which Virginia judges are selected, that elusive distinction leaves Appellees adrift in the open ocean, with the fact that judges are always licensed attorneys, whereas, presumably, administrative agency decision-makers are not, providing the only flotsam in sight to grab ahold of. Of course, that begs the question whether the mere fact that one holds a license to practice law is a *sufficient* objective criterion on which being elevated to the bench should depend. Anyone who has practiced law knows that it isn't. But that is an argument for a different day, before a different branch of government.[7]

The exposure of the fallacious reasoning underlying the argument that would establish the *Goldberg* line of demarcation between agency and court decisions of a judicial nature, leads to the conclusion that the *Goldberg* court painted with a much broader brush—as one would expect when SCOTUS issues an opinion— applying its rationale to *all* decision-makers engaged in decisions *of a judicial*

---

[6] "Distinguishing among officers on the basis of their title rather than the function they perform is 'empty formalistic reasoning of the highest order.'" *Printz v. U.S.*, 521 U.S. 898, 929, fn. 14 (1997).

[7] As a condition precedent to putative judicial candidates' eligibility for selection, The Virginia General Assembly should require a passing grade on an advanced bar examination.

*nature*, regardless of either their job-title or the branch of government that employs them.[8]  Thus, it is the *nature* of the decision itself—judicial, as opposed to legislative or executive—that serves as the line of demarcation, for that is the only distinction that provides any coherence to the *Goldberg* decision.  Thus, Appellees must now concede that they, like their administrative agency counterparts, are bound by the *Goldberg* rule whenever they make dispositive rulings that extinguish a litigant's property right in his lawsuit.  *Q.E.D.*

### D. EDVA necessarily found that the substantiality doctrine barred Leiser's constitutional claims

From its ruling dismissing Leiser's complaint, it follows that EDVA applied the substantiality doctrine,[9] and found his complaint to be

> so insubstantial, implausible, foreclosed by prior decisions of [SCOTUS], or otherwise completely devoid of merit as not to involve a federal controversy, [for] [d]ismissal for lack of [SMJ] because of the inadequacy of the federal claim is proper only when the claim [fails that test]."  *Steel Co.* at 523 U.S. 83, 89.

Thus, asserting a justiciable case or controversy—the required ticket for entry into federal court—presents a very low bar for this litigant to step over.

---

[8] *Feldman* emphasized that, "the form of the proceedings is not significant.  It is the nature and effect which is controlling[,]" *Id.* at 460 U.S. 462, 482, and reiterated that, "the nature of a proceeding 'depends not upon the character of the body but upon the character of the proceedings.'" *Feldman* at 460 U.S. 462, 477 (internal citations omitted).
[9] *See*, *Davis v. Pak*, 856 F.2d 648, 650-51 (4th Cir. 1988).

Essentially, the test is whether Leiser's claims—that Apellees violated his procedural and substantive due process rights—have a pulse, and can fog a mirror, or, instead, are dead on arrival. And EDVA's apparent application of the substantiality doctrine to flush Leiser's claims was in error, for, "dismissal for insubstantiality is appropriate only where the proffered claim is truly frivolous." *Davis* at 651. While reasonable minds might differ about the merits of Leiser's claims, they could not reasonably be characterized as frivolous, and therefore, this case does not present the appropriate circumstances for application of the substantiality doctrine to dismiss his claims.

### E. Leiser has legal standing to bring this case

The existence of an Article III "case or controversy" depends upon whether the party asserting the claim has legal standing to do so. That, in turn, requires the plaintiff to demonstrate that, (a) he has suffered, or is threatened with "a concrete and particularized injury"—an "injury in fact;" (b) that is "fairly traceable" to the actions of the defendant; and (c) that the injury will likely be redressed by a favorable decision. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990). "This triad of injury-in-fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co.* at 523 U.S. 83, 103-04.

30

1. **Leiser has (a) suffered and is threatened with a concrete and particularized injury; (b) that is "fairly traceable" to Appellees' actions**

Leiser's "injury in fact" that is "fairly traceable" to Appellees' actions is demonstrated by (J.A. at 28-31, § VI, ¶¶ A-P), which assert that they deprived him of his A-14 right to both procedural and substantive due process, when they extinguished his property right in his state-court lawsuit by sustaining the demurrer to three of his tort claims, with prejudice, and without explanation, in contravention of both *Goldberg* and Virginia substantive law that governed those proceedings. Therefore, Leiser has asserted a personal stake in defending the enforcement of the *Goldberg* rule, a stake that is distinguishable from the generalized interest that every person subject to the jurisdiction of the Virginia courts has in their faithful adherence to the rule of law. Leiser suffered particularized harm when his property right in his lawsuit was extinguished by Appellees, without any explanation or justification. For that reason, Leiser has "suffered an injury in fact, thus giving [him] a sufficiently concrete interest in the outcome of the issue in dispute." *Hollingsworth v. Perry*, 133 S.Ct. 2652, 2663 (2013).

2. **. . . and (c) Leiser's injury will likely be redressed by a favorable decision in this case**

Tacitly conceding that Leiser has asserted injury in fact that is fairly traceable to their actions, Appellees focused their attack on the "redressability" component of

31

the legal standing analysis.  Presumably adopting their rationale, EDVA apparently based its decision to dismiss Leiser's case on their argument that since the state court lawsuit had come to an end long before Leiser filed the instant federal lawsuit, a mere declaration by EDVA that Appellees violated Leiser's constitutional rights in the past will provide Leiser with nothing more than the "psychic satisfaction" of knowing that the rule of law has been vindicated—a remedy held by SCOTUS to be insufficient to satisfy the redressability prong of the legal standing analysis.  *Steel Co.* at 523 U.S. 83, 106 (1998).  Appellees argue that Leiser's request for relief in this case is retrospective in nature, because, if granted, it would merely declare their past violation of his constitutional rights in a state-court case that has long-since concluded and cannot be revived, and, for that reason, *this* case would have no impact on the rights and responsibilities of the parties to the original state court litigation, *vis-à-vis* each other.

The argument seems to be that Leiser's tonic—limited to only declaratory relief—the relatively toothless remedy Congress chose to provide litigants for state-court judges' deprivations of their constitutional rights—will be ineffective to cure any constitutional violations committed by them in the past, rendering his injury non-redressable, and thereby, defeating his legal standing.  Under their analysis, Leiser is nothing more than a concerned bystander, whose interest in this

32

case is indistinguishable from the general interest of every citizen of Virginia in the proper application of the Constitution and laws arising thereunder.

EDVA's apparent conclusion that no active controversy any longer exists is mistaken. Because Appellees' flawed analysis ignores the fact that Leiser's FAC alleges that he is and has been a party to a number of lawsuits in various courts of the Commonwealth. FAC alleges that the identical conduct complained of here—dismissal of claims without explanation by trial court judges—has occurred in many of those other lawsuits. FAC also asserts the substantial likelihood that similar violations will occur in the future, in those cases to which Leiser is currently a party, and that remain pending before various Virginia state courts. J.A. at FAC at § IV, ¶¶ 9 -15. Thus, he has sufficiently pled not merely hypothetical, imaginary, or speculative injury, but rather, imminent and substantial injury which is sufficiently particularized and concrete. *Steel Co.* at 109. Besides, the unconstitutional rulings handed down in Leiser's state-court case are "capable of repetition, yet evading review," *Sosna v. Iowa*, 419 U.S. 393, 399-400 (1975); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498 (1911), (where a challenged ICC order had expired); *Moore v. Ogilvie*, 394 U.S. 814 (1969).[10]

---

[10] "Where petitioners sought to be certified as candidates in an election that had already been held, the Court expressed its concern that the defendants in those cases could be expected again to act contrary to the rights asserted by the particular named plaintiffs involved, and in each case the controversy was held not to be

Therefore, a declaratory judgment in this case will afford Leiser much more than merely ephemeral vindication for Appellees' past disregard and disrespect of his constitutional rights. "Given the fact that the state courts are joint participants in the governance of the Nation," *Printz* at 521 U.S. at 935, and that their good faith ". . . thus provides an important assurance that '[t]his Constitution . . . shall be the supreme Law of the Land[,]" *Alden v. Maine*, 527 U.S. 706, 755 (1999), the declaratory judgment Leiser seeks will almost certainly have a substantial tangible impact on the adjudication of cases to which he is currently a party. In particular it will likely result in Appellees' deciding dispositive motions in other pending and yet-to-be-filed lawsuits, in a manner consistent with the due process dictates established by *Goldberg*. Such deterrence of future likely constitutional violations is sufficiently "remedial" for purposes of the redressability requirement of Article III standing, when threatened injury is one of the gravamens of a plaintiff's complaint, as it is here. *Steel Co.* at 523 U.S. 83, 108. Because Leiser's FAC establishes that he has "suffered [and continues to] be threatened with, an actual injury traceable to [Appellees] and likely to be redressed by a favorable judicial decision," *Lewis* at 477, he has demonstrated that he is faced with "actual or threatened injury" that is sufficiently "distinct and palpable" to support his

---

moot because the questions presented were 'capable of repetition, yet evading review.'" *Id.*

standing to invoke the authority of EDVA.  *ASARCO Inc. v. Kadish*, 490 U.S. 605, 618 (1989).

### 3.  Leiser prevails under one construction of *Goldberg,* and is defeated under a different construction

It is clear that Leiser's claims easily meet the criteria for setting forth a justiciable case or controversy under Article III.  As stated by SCOTUS,

> . . . [T]he district court has jurisdiction if 'the right of the [plaintiff] to recover under [his] complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,' unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'  *Verizon Maryland v. Public Service Com'n of Maryland*, 535 U.S. 635, 643 (2002) *quoting Steel Co.* at 523 U.S. 83, 89.

Here, Leiser wins under one construction of the *Goldberg* decision—if its line of demarcation is established between *all* governmental decisions of a judicial nature and those of a non-judicial nature—and loses under another—if, as Appellees contend, and EDVA agreed, the *Goldberg* line of demarcation lies between administrative agency decisions and court decisions, generally.

### F.  Leiser's civil rights claims are entitled to various strong presumptions that render them impervious to a challenge as to their justiciability under Article III

As has been conclusively demonstrated, Leiser's constitutional claims cannot reasonably be characterized as frivolous; they don't merely have a pulse; they have

35

legs, if not wings.  And that is before considering any of the multiple presumptions that apply in his favor.  Not that his *Goldberg* argument needs those crutches in order to walk.  But while we are still on the topic, we might as well continue to beat this long-since-dead horse.

First, since Appellees challenged EDVA's exercise of SMJ over FAC, they are deemed to have launched a facial attack against it, thereby requiring EDVA to assume the truth of all of Leiser's factual allegations, and all reasonable inferences therefrom, to determine whether, standing alone, FAC "pleaded jurisdiction and a meritorious cause of action."  *Dickey v. Greene*, 729 F.2d 957, 958 (4th Cir. 1984).  This Court's *de novo* review of EDVA's order dismissing FAC imposes the same obligation on it.  Likewise, Appellees' challenge to FAC on 12(b)(6) grounds required EDVA, and this Court on appeal, to assume the truth of all of Leiser's factual allegations, along with all reasonable inferences that flow from those facts, "to determine whether Leiser has alleged facts sufficient to make a particular cause of action *plausible*."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

In addition, because this case raises *bona fide* civil rights issues, Leiser's claims are, for that reason, entitled to special deference by this Court.  In the not so distant past, the right of women to vote; the right of black people—to dine in the same establishments, drink from the same water fountains, use the same public restrooms, attend the same schools, or ride in the same part of a bus or train, as

white people; even the right of whites and blacks to intermarry; were all considered by many to be insubstantial, implausible, foreclosed by prior decisions of the federal courts, including SCOTUS, or otherwise completely devoid of merit as not to involve a federal controversy.  More recently, engaging in homosexual acts evolved from felony[11] to fundamental right[12] in less than thirty years.

The special deference afforded to seemingly novel claims of civil rights is particularly pronounced in this case.  This case argues plainly and unequivocally, that the courts of this Commonwealth have not delivered the justice system that We, the People, were promised.  And while there are factors that make Leiser's constitutional arguments less relevant and less compelling against federal court judges,[13] his arguments may hit uncomfortably close to home.  It is for that reason this Court should not reject Leiser's arguments as "so insubstantial, implausible, foreclosed by prior decisions of the federal courts, or otherwise completely devoid of merit as not to involve a federal controversy."  *Steel Co.* at 89.  To do so would create the strong presumption that this Court merely wishes to sweep the matter under the rug, in order to insulate its state-court colleagues, and possibly its own judges, from unwanted scrutiny and criticism of their decisions.  But should this

---

[11] *Bowers v. Hardwick,* 478 U.S. 186 (1986)

[12] *Obergefell v. Hodges,* 135 S.Ct. 2584 (2015)

[13] Leiser does not know, for example, whether a Virginia federal court would adopt the same view, that, under federal law, a lawsuit is a personal property right.  Also, in the federal courts, civil litigants have an automatic right to appeal, unlike their Virginia state-court counterparts.

Court decline to exercise SMJ over this controversy, it will be viewed as the traffic

cop at the scene of a horrific accident, telling bystanders, "move it along, folks.

There is nothing to see here." *Goldberg* is not just a good idea; it's the law.

WHEREFORE, for all of the foregoing reasons, Leiser respectfully moves this

Honorable Court to reverse EDVA's judgment that Leiser failed to allege a

justiciable case or controversy under Art. III, §2, and remand this case to that court

for further proceedings, including consideration of Appellees' other affirmative

defenses.

## VII.   Argument (Part 2)

### The *Rooker-Feldman* abstention doctrine poses no obstacle to EDVA's exercise of SMJ over this case

**A. Introduction**

During the Civil War, more than one million Americans—nearly three percent

of the entire U.S. population at the time—spilled their blood on the battlefields of

Gettysburg, Spotsylvania Courthouse, Chancellorsville, Manassas, Fredericksburg,

and elsewhere, in the costliest war, in terms of human casualties, that the U.S. has

ever fought.  The Confederate states, including their capitol, Virginia, were not

admitted back into the Union, and did not have their rights restored as full

participants in our dual-sovereign representative democracy, in exchange for their

agreement to the precatory language with which this Court has tacitly imbued A-

14, relegating its commands to nothing more than aspirational goals for the several States to consider and adopt, at their convenience.

This Court was created pursuant to the Judicial Power of the U.S.; it was deputized by the Congress—the representatives of the People; and it was armed with the Constitution—in particular, 42 U.S.C. § 1983, enacted pursuant to § 5 of A-14—its enforcement provision—to stand between the People and the tyranny of state action—the abuse of governmental power through its arbitrary exercise—whether that power be exercised by the Executive, Legislative, or Judicial branch.

The resistance against state tyranny did not end with the surrender of General Lee to General Grant at the courthouse in Appomattox in April 1865; that struggle has taken on countless variety of new forms and continues to this day.  Only the venue has changed, from the battlefield to the courtroom.  This case calls upon this Court to recognize that the constitutional principles forged a century and-a-half ago, out of the collective sacrifice of those who fought and died over them, ought to be sanctified with something bolder than the anodyne tea the lower federal courts have been serving aggrieved state-court litigants for the past three decades, while sitting impotently on the sidelines of constitutional controversies involving state-court rulings of a judicial nature, and thereby abdicating to the State courts *their* duty, under the Supremacy clause, Art. VI, § 2, to interpret the Constitution.

This case challenges this Court to reconsider the *Rooker-Feldman* doctrine ("*R-F* doctrine"), particularly in light of the Federal Court Improvement Act of 1996, which amended 42 U.S.C. § 1983 ("the 1996 amendment"). But beyond considering the impact of that amendment on the continued vitality of the *R-F* doctrine, a closer reading and more careful analysis of its eponymous cases reveals that its doctrinal status is not attributable to SCOTUS; instead, that doctrine was a well-intentioned but misguided creation of the lower federal courts. Similarly, revisiting the history of A-14, the statutory construction and legislative history of § 1983, as well as SCOTUS precedents on the subject, reveals that, unlike the bedrock jurisprudential considerations of comity, preclusion, judicial economy, and federalism that *animate* the *R-F* doctrine, the doctrine itself is sculpted from sand, built around a foundation of ice, and sits on the edge of the shore, on a hot summer day, at the start of high-tide.

And while it is appropriate to consider the principle of *stare decisis* before jettisoning a well-entrenched legal doctrine, where, as here, constitutional questions are at issue, the principle of *stare decisis* is less constraining. *Edelman v. Jordan*, 415 U.S. 651, 671 (1974). Furthermore, blind adherence to that principle must be balanced against the admonition of Thomas Paine, who wrote, in *Common Sense*, published in 1776, ". . .a long habit of not thinking a thing wrong lends it the superficial appearance of being right . . . ." Should this Court choose not to

40

lead, but instead, continue to follow its anachronistic *R-F* precedents, while sitting

impotently on the sidelines of constitutional challenges to state-court judicial

rulings, it will find itself on the wrong side of history.

### B. The issue on appeal presents an issue of first impression

The issue for this Court to decide is one of first impression, and distills to

this:  Does a federal district court plaintiff who meets the first three *Exxon-Mobil*

criteria for application of the *R-F* doctrine, but who seeks *only declaratory* (non-

coercive) relief, thereby ask that court to engage in an impermissible "review and

rejection" of the state-court judgment at issue?  As will be demonstrated, the

answer to the inquiry is unhesitatingly, "no."[14]

### C. Purpose of the *Rooker-Feldman* doctrine

The *R-F* doctrine is rooted in the principle that the federal question jurisdiction

created by 28 U.S.C. § 1331 confers strictly original jurisdiction on the district

courts.  As such, those courts may not be conscripted into service as *de facto*

appellate tribunals by disappointed "state court losers complaining of injuries

caused by state-court judgments rendered before the district court proceedings

commenced, and inviting district court *review and rejection* of those judgments."

_____

[14] ". . . [W]hen the relief sought by the plaintiffs would not reverse or "undo" the
state-court judgment, [*R-F*] does not apply."  *Mo's Express, LLC v. Sopkin*, 441
F.3d 1229, 1237 (10th Cir. 2006).

*Lance v. Dennis,* 546 U.S. 459, 464 (2006), quoting *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284 (2005).  (emphasis added).

Phrased a different way, "the [*R-F*] doctrine forbids claims that 'seek redress for an injury caused by the state-court decision itself' because they 'ask the federal district court to conduct an *appellate review* of the state-court decision.'"  *Adkins v. Rumsfeld*, 464 F.3d 456,464 (4th Cir. 2006), *quoting Davani* at 434 F.3d 712, 719 (emphasis added).  "In other words, the doctrine applies 'where a party *in effect seeks to take an appeal* of an unfavorable state-court decision to a lower federal court.'"  *Id.*  (emphasis added).  "[T]he test is . . . whether the relief [sought] would *'reverse or modify'* the state court decree."  *Id.*  "A party losing in state court is barred from seeking what in substance would be *appellate review* of the state judgment in a [federal] district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."  *Id.*  (emphasis added).

The italicized phrases in the preceding passages bring sharply into focus the issue presented by this appeal—for purposes of the *R-F* doctrine, what constitutes appellate review?  Judicial remedies fall broadly into two categories—coercive and non-coercive.  Damages awards and injunctive relief are clearly coercive remedies, while declaratory relief is non-coercive.  But appellate review is the *most* coercive remedy.  An appellate court can vacate, reverse, or modify a lower-court decision, or remand it with instructions as to how to proceed.  And even when the appellate

court is in full agreement with the decision of the lower court, its affirmance of the lower court's judgment supplants that judgment with its own. Thus, even in affirming a lower court's judgment, the appellate court acts in a coercive manner.

The challenge then, for this Court, is to determine whether *R-F* should be construed narrowly, to prohibit the lower federal courts from reviewing state-court judgments that raise constitutional questions, *only* when the state-court loser asks that federal court for either injunctive, or for truly appellate relief—as where he asks the lower federal court to "reverse," "modify," or "vacate" a state-court judgment, or, whether the doctrine should be construed broadly, to require abstention by the lower federal courts even when the state-court loser asks the federal court for only declaratory relief—"an alternative to the strong medicine of the injunction"[15]—from the state-court judgment. For the following reasons, this Court should construe *R-F* narrowly, to exclude from its purview federal claims that seek only declaratory relief from state-court judgments, where the state-court judgments, themselves are alleged to suffer from some constitutional infirmity.

---

[15] *Steffel v. Thompson,* 415 U.S. 452, 466 (1974).

43

### D. *R-F* doctrine is the product of a negative inference, rather than a positive command

The *R-F* doctrine is a product of the negative inference arising from SCOTUS'

congressional grant of appellate jurisdiction, pursuant to 28 U.S.C. § 1257(a),

under which a decision of a state's highest court raising a federal question is

subject exclusively to the discretionary appellate jurisdiction of SCOTUS. By

negative implication, then, the lower federal courts may not exercise appellate

jurisdiction over such state-court decisions. *Lawrence v. Welch*, 531 F.3d 364, 368

(6th Cir. 2008); *accord, Mo's Express* at 441 F.3d at 1233 (same analysis).

In *Adkins*, 464 F.3d 456, this Court emphasized that only SCOTUS had been

vested by Congress with jurisdiction to review state-court decisions. *Id.* at 464

F.3d 456, 463, *citing* 28 U.S.C. § 1257. It characterized the *R-F* doctrine as a

corollary to that rule, prohibiting "lower federal courts . . . from exercising

*appellate jurisdiction* over final state-court judgments[,]" *Id.* (emphasis added),

but underscored that [*R-F*] is a "narrow doctrine." *Id.*[16]

That *R-F* is a derived from a negative implication, as opposed to a positive

command, and one that derogates from the federal courts' presumptive jurisdiction,

---

[16] Three years before the *Exxon* decision narrowed the lower federal courts'
interpretation of the *R-F* doctrine, this Court characterized it as a "beleaguered"
doctrine. *Vulcan Chemical Technologies, Inc. v. Barker*, 297 F.3d 332, 344 (fn. 2)
(4th Cir. 2002).

under Article III, §2, over controversies raising constitutional issues, militates in favor of a narrow interpretation of the doctrine.

### E. SCOTUS has applied *R-F* only twice

The narrowness of *R-F* is underscored by the fact that SCOTUS has applied it only twice to deprive a federal district court of SMJ —the first time, in 1923 (*Rooker*), and the second (and last) time in 1983 (*Feldman*). As noted by the *Exxon* court, "[s]ince *Feldman*, this Court has never applied [*R-F*] to dismiss an action for want of jurisdiction. The few decisions that have mentioned [its eponymous cases] have done so only in passing or to explain why those cases did not dictate dismissal." *Exxon* at 544 U.S. 280, 287. The infrequency of its application by SCOTUS speaks to the truly unusual circumstances that summon its assistance, and cast doubt upon the lower federal courts' elevation of the principle to doctrinal status.

### F. The *Exxon* court itself admonished the lower federal courts to interpret *R-F* narrowly

In *Exxon Mobil*, 544 U.S. 280, a *unanimous* Court reminded the lower federal courts that it had applied the *R-F* doctrine only twice—in *Rooker II* in 1923, and not again until sixty years later, in 1983, in *Feldman*.[17] The *Exxon* court

---

[17] In the decade since *Exxon* was decided, SCOTUS has never applied the *R-F* doctrine to deprive a federal district court of SMJ. The *Exxon* court also noted that, "[t]he few decisions that have mentioned *Rooker* and *Feldman* have done so

admonished the lower federal courts, noting that they had "sometimes . . . construed [the *R-F* doctrine] to extend far beyond the contours of the *Rooker* and *Feldman* cases, overriding Congress' conferral of federal-court jurisdiction concurrent with jurisdiction exercised by state courts . . . ." *Exxon* at 544 U.S. 280, 283, (2005).

The *Exxon* court recounted the jurisprudential underpinnings of the doctrine, noting that, "*Rooker* was a suit commenced in Federal District Court to have a judgment of a state court, adverse to the federal court plaintiffs, 'declared null and void.'" *Exxon* at 544 U.S. 280, 283-84.[18]  It went on to explain that the *Rooker* and *Feldman* suits were

> impermissible, . . . emphasiz[ing] that *appellate jurisdiction to reverse or modify* a state-court judgment is lodged, initially by § 25 of the Judiciary Act of 1789, . . . and now by 28 U.S.C. § 1257, exclusively in this Court. Federal district courts, we noted, are empowered to exercise original, not appellate jurisdiction.  Plaintiffs in *Rooker* and *Feldman* had litigated and lost in state court. Their federal complaints, we observed, essentially invited federal courts of first instance *to review and reverse* unfavorable state-court judgments.  We declared such suits out of bounds, *i.e.,* properly dismissed for want of [SMJ].  *Exxon* at 544 U.S. 280, 283-84.  (emphasis added).

only in passing or to explain why those cases did not dictate dismissal." *Exxon* at 544 U.S. 280, 287.

[18] In both places where it discussed the case, the *Exxon* court neglected to mention that the *Rooker* plaintiffs sought injunctive relief as well as declaratory relief.  That was an important fact the High Court should not have overlooked.

The *Exxon* court reasoned that,

> If the state-court decision [in *Rooker*] was wrong, . . . 'that did not make the judgment void, but merely left it open to *reversal or modification in an appropriate and timely appellate proceeding.*' Federal district courts . . . lacked the requisite appellate authority, for their jurisdiction was 'strictly original.' . . . Among federal courts . . . Congress had empowered only this Court *to exercise appellate authority 'to reverse or modify'* a state-court judgment. . . *Exxon* at 544 U.S. 280, 284-85, *quoting (in various places), Rooker* at 263 U.S. 413, 414-17. (emphasis added).

More directly, the *Exxon* court explained that,

> *Rooker* and *Feldman* exhibit the limited circumstances in which this Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a [U.S.] district court from exercising [SMJ] in an action it would otherwise be empowered to adjudicate . . . In both cases, the losing party in state court filed suit in federal court after the state proceedings ended, complaining of an injury caused by the state-court judgment *and seeking review and rejection* of that judgment. Plaintiffs in both cases, alleging federal-question jurisdiction, *called upon the District Court to overturn an injurious state-court judgment.* Because § 1257, as long interpreted, vests authority to review a state court's judgment solely in this Court, (internal citations omitted), the District Courts in *Rooker* and *Feldman* lacked [SMJ]. *Exxon* at 544 U.S. 280, 291-92. (emphasis added).

> 'The [R-F] doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise *appellate jurisdiction* over state-court judgments which Congress has reserved to this Court. . . . § 1257(a).' *Id.* at 292.

47

**G. In both *Rooker* and *Feldman*, the federal-court plaintiffs asked for *both* declaratory *and injunctive relief***

**1.  Analysis of *Rooker***

In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), plaintiffs who lost in state-court filed suit in district court, seeking a declaration that the state trial court judgment was null and void, "*and to obtain other relief dependent on that outcome.*"  *Id.* at 263 U.S. 413, 414 (emphasis added).  SCOTUS affirmed the district court's decision that it lacked SMJ.  The language of its opinion is critically important.  It held,

> . . . [T]he [state trial court] judgment was rendered in a cause wherein [that court] had jurisdiction of both the subject-matter and the parties, . . . a full hearing was had therein, . . . the judgment was responsive to the issues, and . . . it was affirmed by the Supreme Court of the state on an appeal by the plaintiffs . . . .  If the constitutional questions stated in the bill actually arose in the cause, it was the province and duty of the state courts to decide them; and their decision, whether right or wrong, was an exercise of jurisdiction.  If the decision was wrong, that did not make the judgment void, but merely left it open to *reversal or modification* in an appropriate and timely appellate proceeding.  Unless and until so *reversed or modified*, it would be an effective and conclusive adjudication.  (emphasis added).
> . . .
> Under the legislation of Congress [Judicial Code, § 237][19], no court of the United States other than [SCOTUS] could entertain a proceeding *to reverse or modify* [a state court] judgment for [constitutional] errors . . . .  To do so would be an exercise of appellate

---

[19] This jurisdictional statute was an antecedent to § 1257(a).

48

jurisdiction.   The jurisdiction possessed by the District Courts is strictly original.  *Id.* at 263 U.S. 413, 416. (emphasis added).[20]

### 2.  Analysis of the *Feldman* case

Between 1923, when *Rooker* was decided, and 1983, when SCOTUS decided *Feldman* (discussed, *infra*), *Rooker* was cited only twice, and in neither case, to deprive a federal district court of SMJ.  Then, in 1983 the High Court decided *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  In that case, two applicants for admission to the D.C. Bar (collectively, "Feldman") were rejected by the D.C. Court of Appeals, and "sought a 'declaration that [the D.C. Court of Appeals] actions . . . violated the Fifth Amendment . . . *and . . . an injunction requiring [that court] either to grant [them] immediate admission to the [D.C.] bar or to permit [them] to sit for the bar examination as soon as possible.*" *Feldman* at 460 U.S. 462, 468-469, quoting from his complaint.  (emphasis added).

The *Feldman* court held that, even where challenges to such state court judicial proceedings are constitutionally based, review of final determinations of state courts in judicial proceedings are reserved to SCOTUS.  U.S. District Courts do not have jurisdiction to review them.  *Feldman* at 460 U.S. 462, 476 and 486, *citing* 28 U.S.C. § 1257.

---

[20] The *Rooker* court also noted that the time period for an appeal of the state-court judgment to SCOTUS had expired before the federal district court case was filed. ". . . [A]nd . . . after that period elapses an aggrieved litigant cannot be permitted to do indirectly what he no longer can do directly."  *Id.* at 263 U.S. 413, 416.

Important to the *Feldman* court's analysis, and its holding that the district court could not exercise SMJ over his challenge to the D.C. Court of Appeals' (state court's) decision denying him admission to the Bar, was "the strength of the state interest in regulating the state bar." *Feldman* at 460 U.S. 462, fn. 16. "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" *Id., quoting Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975). That generalized deference to the highest courts of the several States in regulating matters pertaining to the admission, discipline, and disbarment of members of their bars was even more pronounced in *Feldman*, because Congress had specifically *divested* the lower federal courts of jurisdiction over matters pertaining to the D.C. Bar, including the "authority to supervise admission [of applicants]," and had vested that authority, instead, in the D.C. Court of Appeals—"the highest court of that state." *Feldman* at 460 U.S. 462, 463-64, *citing* The District of Columbia Reform and Criminal Procedure Act of 1970. No similar consideration exists in the instant case, such that the lower federal courts should hesitate to exercise SMJ over this dispute.

**H. The legislative history of §1983 supports this Court's exercise of SMJ in this case**

The legislative history of §1983 was recounted in *Mitchum v. Foster*, 407 U.S. 225 (1972), in which the Court stated,

50

Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . . It was 'modeled' on § 2 of the Civil Rights Act of 1866, . . . and was enacted for the express purpose of 'enforc(ing) the . . . [14th] Amendment.' *Id.* at 238.

The Reconstruction era legislation, of which § 1983 was an important part,

clearly established

. . . the role of the Federal Government as a guarantor of basic federal rights against state power. . . . Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation. *Mitchum* at 238-39.

. . . The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, *or judicial*.' *Id.* at 242, *quoting Ex parte Virginia*, 100 U.S. 339, 346 (1879). (emphasis added).
. . .
Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights. *Id.* at 240.

The prohibitions of the Fourteenth Amendment are directed to the States, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, *or judicial. Such enforcement is no invasion of State sovereignty. Ex parte Virginia* at 346. (emphasis added).

### I. The enactment of §1983 demonstrated Congress' intent that the lower federal courts would have some limited oversight of state court judges

Section 25 of the Judiciary Act of 1789, conferring on SCOTUS exclusive

*appellate* jurisdiction over state court judgments raising federal questions,

obviously existed when §1983—§1 of the Civil Rights Act of 1871—was enacted.

If Congress believed that SCOTUS' review of state-court decisions implicating

federal law constituted sufficient oversight of those courts, then why would it have

enacted §1983—a statute that was largely designed to target state courts and their

judges?  Interpreting §1983 to preclude any type of federal court oversight of state

courts renders nugatory the language of that statute, as well as the Supremacy

Clause, Art. VI, § 2.

### J. The 1996 Amendment to §1983 eliminates the concerns that inform the *R-F* doctrine

The Federal Courts Improvement Act of 1996 amended § 1983, and eliminated

the availability of injunctive relief against state-court judges, while preserving the

non-coercive remedy of declaratory relief.  That amendment eliminated the

concerns that the *R-F* doctrine addressed.  Prior to the 1996 Amendment, when

injunctive relief was available as a remedy against state court judges, petitioners

generally requested it in an effort to make end-runs around SCOTUS, either

because they missed their filing deadline for a direct appeal of the challenged state

court judgments, or else because SCOTUS had declined to grant discretionary

appellate review of those adverse state court decisions. But with the enactment of the 1996 amendment, Congress erected an impermeable barrier to attempted end-runs around 28 U.S.C. § 1257. No longer can a state court loser employ §1983 to conscript the federal district courts, to act as *de facto* appellate tribunals over state courts. That statute has been defanged, at least with respect to its application to state-court judges. A §1983 plaintiff can obtain only a declaration that the disputed state court ruling violated the Constitution. While, in some sense, this constitutes a "review" by a federal district court of a state court judgment, it is not the type of coercive appellate review that is vested exclusively in SCOTUS, and therefore prohibited to the district courts.

As amended, § 1983 imposes liability on "every person who, under color of [state law] subjects . . . any [person] to the deprivation of any rights . . . secured by the Constitution . . . in an action at law, suit in equity, *or other proper proceeding for redress . . . .*" 42 U.S.C. § 1983 (emphasis added). Since actions at law for damages and suits in equity for injunctive relief are not available remedies against state court judges acting in their official judicial capacities, if § 1983 is to retain any meaning with respect to state court judges, that meaning must be found in the phrase "or other proper proceeding for redress." Leiser contends that suits for declaratory relief are precisely the "other proper proceeding for redress" referenced therein. Besides imparting meaning to that otherwise empty phrase, Leiser's

53

interpretation properly balances the legitimate concern of limiting true appellate review of state court judgments exclusively to SCOTUS, while breathing vitality into the Supremacy Clause, which states,

> The Laws of the United States . . . shall be the supreme Law of the Land; *and the Judges in every State* shall be bound thereby." *Art. VI, cl. 2.*  (emphasis added).

Thus, if the role of the inferior Article III courts is limited to the issuance of declaratory judgments as to the constitutionality of state court judgments and orders, a proper balance is struck between ensuring the supremacy of federal law, while not encroaching on the exclusive appellate jurisdiction of SCOTUS. Striking that balance became much easier after the enactment of the 1996 amendment to § 1983.  No longer can a disappointed state court litigant circumvent the exclusive appellate jurisdiction of SCOTUS by seeking review and reversal of a state court judgment in federal district court.  But at the same time, the federal district courts, which are part of the Judicial Branch of our government, have an important role to fulfill in ensuring that federal law reigns supreme.

EDVA's interpretation of *R-F* goes too far in foreclosing the federal courts (other than SCOTUS) from interpreting the constitution.  Instead, EDVA effectively abdicated its duty to VSC, to the exclusion of the federal courts, because, as a practical matter, confining the remedy for state-court judicial violations of constitutional rights to the discretionary appellate review by SCOTUS

54

is to effectively deprive persons injured by those constitutional violations of a meaningful remedy, for, ". . . it was obvious that [SCOTUS] alone could not hear all federal cases throughout the [U.S.]." *Printz v. U.S.*, 521 U.S. 898, 907 (1997). Indeed, SCOTUS grants roughly 75-80 *cert.* petitions each year out of 10,000 that are filed—less than 1%. The lower federal courts will leave litigants injured by deprivations of their constitutional rights to the mercy of the state courts, effectively putting each of the 50 states in charge of interpreting the constitution as it sees fit, within its jurisdiction. That is decidedly inconsistent with the notion of federal supremacy regarding matters involving the interpretation and application of constitutional principles.

Leiser's proposed compromise preserves SCOTUS's role as the exclusive forum for appellate jurisdiction over federal questions decided by the highest state appellate courts, while appropriately enlisting the invaluable assistance of its inferior federal tribunals to develop the common law principles surrounding federal constitutional rights. This role of the subordinate federal courts is supported by the fact that decisions by SCOTUS denying discretionary appellate review are not considered decisions on the merits. *Boumediene v. Bush*, 550 U.S. 1301 (2007). Thus, when SCOTUS denies a petition for a writ of *certiorari,* it is making no comment on the merits of the underlying dispute, or any of the federal questions raised therein. It is simply staying out of that particular fight, leaving it

55

to its inferior federal courts, in a "proper proceeding" to declare the constitutional rights of the litigants. The lower federal courts, which *share* the Judicial Power of the U.S., under Art. III, §1, are vested with the authority, and have the expertise to interpret the Constitution. And so long as they are vested with only non-coercive relief in the form of issuing declaratory judgments, principles of sovereignty, federalism, supremacy of federal law, and comity are all kept in proper balance.

## VIII. Conclusion

In creating the *R-F* doctrine, the lower federal courts have erected a wall, shrouded in electrified razor-wire, and separating themselves from the state courts. The problem is, they left the Constitution on the other side of that wall, for the state courts to interpret and apply, or ignore, with almost zero oversight. In light of the history of A-14, §1983, and Art. VI, § 2, the lower federal courts abdicate their constitutional duty to stand between the People and the tyranny of government, and to ensure that the Constitution reigns Supreme, when they effectively say to a state-court litigant, "Gee, we are so sorry that the state courts deprived you of your constitutional rights, but our hands are tied, and there is nothing we can do or say about that. You need to take your complaint to SCOTUS. Maybe they will help you out, if they're not too busy. We wish you good luck, but, hey, since your statistical probability of getting your case reviewed by SCOTUS is less than 1%,

56

you might want to purchase a lotto ticket on your way to filing your petition." It is time to tear down that wall.

This Court should ignore the siren song of the so-called *R-F* doctrine. It may have topped the charts three decades ago, but it was nothing more than a two-hit wonder that has long-since become a tired relic of the past. In his dissenting opinion in *Lance*, Justice Stevens praised Justice Ginsberg's "lucid opinion" written one year earlier for a unanimous Court in *Exxon Mobil*, and which he argued "finally interred the . . . [*R-F*] doctrine." *Lance* at 468. His dissent praised the majority's opinion for refusing to "resuscitat[e] . . . a doctrine that has produced nothing but mischief . . . ." Despite its apparent interment nearly a decade ago, EDVA summoned *R-F* back from the grave. This Court should not allow its resurrection. *R-F* is a doctrine that deserves a proper burial, and this case should serve as its casket.

WHEREFORE, Leiser respectfully requests that this Honorable Court reverse EDVA's decision that it lacked SMJ over this controversy, and remand this case for further proceedings.

Respectfully submitted,

THE LEISER LAW FIRM, PLLC,

by Counsel

57

*/s/ Phillip B. Leiser, Esq.*

_____

THE LEISER LAW FIRM, PLLC
By: Phillip B. Leiser, Esq.
1749 Old Meadow Road, Suite 630
Tysons Corner, Virginia 22102
TEL: (703) 734-5000, ext. 101
FAX: (703) 734-6000
pbleiser@leiserlaw.com
VASB # 41032
*Counsel for The Leiser Law Firm, PLLC*

## CERTIFICATE OF SERVICE

I, Phillip B. Leiser, Esq., hereby certify that on the 11th day of September, I filed the Initial Brief through the ECF system and on this 15th day of September 2015, I filed the Corrected Brief through the ECF system. This Brief will be sent electronically to the registered participants as identified on the Notice of Filing.

*/s/ Phillip B. Leiser, Esq.*
Phillip B. Leiser, Esq.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** _____        **Caption:** _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

    [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____